## UNITED STATES v. CHARLICK et al.
### No. 7657.

District Court, E. D. Pennsylvania.
Jan. 6, 1939.

204

· J. Cullen Ganey; U. S. Dist. Atty., of Bethlehem, Pa., and Walter A. Gay, Jr., Asst. Dist. Atty., of Philadelphia, Pa.

Henry W. Balka and Bernard R. Cohn, both of Philadelphia, for defendants.

KIRKPATRICK, District Judge.

The defendants were tried upon an indictment charging them with conspiracy to violate the Act of June 13, 1934, C. 482, 40 U.S.C., § 276b, 40 U.S.C.A. § 276b, commonly called the "Kick-Back" Act. Trial by jury was waived. A summary of the evidence is as follows:

The two defendant were partners as painting contractors in December, 1934. They received a subcontract (oral and informal) for the refinishing of certain doors for the Naval Hospital in Philadelphia, a public building, financed by grants from the United States. In order to obtain the contract it was necessary that it appear that they were paying or would pay their men at the rate of one dollar and twenty cents an hour. It was also necessary in order to be permitted to carry out the contract to appear to be paying this rate during the work.

Prior to the beginning of the work and before they had definitely taken the contract, they had a meeting with their men, three of whom, Fradkin, and Leonard and Carl Swerdloff, appeared here as witnesses. In pursuance of an agreement between themselves, they told the men that they had or could get a painting contract for work at the Naval Hospital provided certain arrangements could be made about wages, but that unless the men agreed, they would not take the job, or go on with the job. It was winter and work was hard to get. At the meeting referred to, which took place at the Labor Lyceum where they were doing another job, the following contract was entered into between the defendants and the men:

The men were to receive one dollar and twenty cents per hour, which, of course, would be paid in the presence of the Government inspector and thus create the impression that the required wage scale was in force. The men would return twenty-five cents per hour immediately to the defendants. It was agreed further that when the contract was completed and the defendants paid, if the contract turned out to be profitable, the defendants would return to the men the twenty-five cents per hour, which the men had paid back to them. The foregoing was the contract of employment entered into between the defendants and the men.

In pursuance of this arrangement, the work was carried out, the men received one dollar and twenty cents per hour under the eyes of the Government inspector. and immediately returned twenty-five cents of it to the defendants. The contract was completed about March, 1934. It resulted in a profit to the defendants. The men have not been paid anything further by the defendants at any time, although demand was made by them about a year and a half after completion of the work.

Some time after this, the exact date of which I do not have, McShain, the general contractor, presented a claim to the Government for additional compensation, amounting to $65,000 arising out of an increased wage scale which he had been compelled to put in force during the

progress of the work. In order to effect a prompt settlement of his claim against the Government, he deposited with the Navy Department checks drawn to the order of the men sufficient in amount to cover their entire claim, with the understanding that they were not to be delivered to them until their legality could be established in some fashion, not definitely specified. This amount is still in the hands of the Navy Department.

Of course, it is evident that both the men and the defendants entered into a scheme to establish a fictitious wage scale, so that the defendants could get and carry on the job and the men could have employment. When I say fictitious I mean in the sense that it was the agreement that if the contract had been unprofitable the men would not have been entitled to the twenty-five cents, and the defendants would not have been bound to pay it, and consequently the apparent wage scale of one dollar and twenty cents per hour would have been twenty-five cents an hour more than the actual wages paid.

Counsel for both defendants request the Court to enter a verdict in favor of the defendants on the entire record. There are no rulings on evidence involved, and the only matter for decision is whether the foregoing facts constitute a crime under the Act of June 13, 1934.

The pertinent part of the statute is as follows: "* * * whoever shall induce any person employed in the construction, prosecution, or completion of any public building, public work, or building or work financed in whole or in part by loans or grants from the United States, or in the repair thereof to give up any part of the compensation to which he is entitled under his contract of employment, by force, intimidation, threat of procuring dismissal from such employment, or by any other manner whatsoever, shall be fined not more than $5,000, or imprisoned not more than five years, or both."

■ The statute is a highly penal one and the defendants are entitled to a strict construction. The offense at which it is aimed is, compelling workmen to return to their employers wages to which the contract between the employer and his employees entitles them. It was not intended to punish the refusal or failure of an employer to pay his men according to a general wage scale fixed by the Government, or to pay them the wages which he may have agreed to pay in his contract with the Government or with the general contractor—contracts to which the men were not parties. U. S. v. Golder, D.C., 11 F.Supp. 870.

When these men returned to their employer twenty-five cents of each dollar and twenty cents which had been paid them under the eyes of the Government inspector, they were not giving up anything to which they were entitled under their contract of employment. On the contrary this procedure was in strict accordance with their contract of employment. What the contract really amounted to was that the employers would pay ninety cents an hour during the progress of the work and an additional twenty-five cents an hour after the work was completed, provided it turned out to be profitable. The subterfuge which the men entered into at the time they received their pay did not affect the substance of their employer's obligation in any way. That was merely a bit of stage play put on to make the Government inspector think that the contract of employment was something other than what it really was.

Later on, the contract of employment was breached by the employers when, having made a profit out of the job, they failed to pay the men the additional twenty-five cents an hour. The ninety cents an hour was paid, and the twenty-five cents, for whatever reason, was not paid.

If the words "give up," in the statute, be susceptible of a broader meaning than "pay back" or "return," and if construed as synonymous with "forego," the question still remains whether the statute was intended to punish a mere breach of the contract of employment as a result of which employees may have been deprived of something to which they were entitled.

■ It seems plain that the general object of this Act was to prevent workmen on Government jobs from being forced to surrender or give up, against their free will, any part of the wages due them under their contract with their employers. It can hardly have been the intention to make it a criminal offense for a contractor to default on what might be called an agreement to pay a bonus provided the job proved profitable—at all events an agreement by which the men voluntarily postponed the payment of part of their wages to a later date and made it then subject to that condition.

■ The words of the Act are "induce * * * by force, intimidation, threat of procuring dismissal from such employment, or by any other manner whatsoever * * *." The rule of ejusdem generis clearly forbids the extension of the general clause to cover a case where the manner in which the employee is deprived of his wages is the making and subsequent breaking of a contract with him.

■ There is no evidence in this case from which I can find that the original contract of employment with the men was made with the purpose to defraud them or with the intent that the additional twenty-five cents an hour should never be paid, or that the employers' default was due to anything other than inability to pay; so that the question which might be presented by such a state of facts does not arise here.

I therefore find the defendants not guilty.